IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| USA FOOTBALL, INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 4:23-cv-00516-ALM |
| FFWCT, LLC, USA FLAG, LLC, and | § | |
| TRAVIS BURNETT, | § | |
| | § | |
| *Defendants.* | § | |

---

**FFWCT, LLC'S, USA FLAG, LLC'S, AND TRAVIS BURNETT'S RESPONSE TO USA FOOTBALL, INC.'S MOTION FOR SUMMARY JUDGMENT**

---

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rules CV-7 and CV-56 of the Local Rules of the Eastern District of Texas, FFWCT, LLC, USA Flag, LLC, and Travis Burnett (collectively, "Flag"), the Defendants in Civil Action No. 4:23-cv-00516-ALM, respectfully request that the Court deny USA Football, Inc.'s ("FB") motion summary judgment (the "Motion").

## I.    <u>SUMMARY OF RESPONSE.</u>

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

According to FB, the first issue to be decided by the Court is "Whether Flag's use of the USA FLAG mark creates a likelihood of confusion with the USA Football Marks." Dk. 62, Motion, § II. "Likelihood of confusion is a question of fact …." *Nat'l Bus. Forms & Printing, Inc.*

---

*v. Ford Motor Co.*, 671 F.3d 526, 532 (5th Cir. 2012) (citations omitted); *Accresa Health LLC v. Hint Health Inc.*, No. 4:18-CV-00536, 2020 WL 4644459, at *64 (E.D. Tex. Mar. 19, 2020), report and recommendation adopted, No. 4:18-CV-00536, 2020 WL 2610908 (E.D. Tex. May 22, 2020) ("[L]ikelihood of confusion is generally regarded as a question of fact and should not be decided … in a motion for summary judgment.").

There is a material legal issue that precludes granting summary judgment for FB. As a matter of law, at least two, if not all four of the Tackle Marks defined below do not include flag football within the scope of the services they cover. Alternatively, the term "football" is ambiguous, as used in two of the Tackle Marks, and may not include flag football within its scope of services. The Court may construe that term, if possible, without extrinsic evidence. If extrinsic evidence is needed, a jury must decide that term's scope. In any event, Flag believes the appropriate construction of "football" as used in the Tackle Marks is that flag football is not included.

Beyond the legal issues, there are genuine issues of several material facts, particularly whether there is a likelihood of confusion between any of the Tackle Marks as FB uses them and USA Flag as Flag uses it.

## II.      STATEMENT OF ISSUES AND QUESTIONS OF FACT.

1.      Are there genuine issues of fact as to whether there is a likelihood of confusion between Flag's use of USA FLAG and FB's '472, '236, '678, and '678 Registrations (the "Tackle Marks")?

2.      Do the '472 and '236 Tackle Marks exclude flag football as a matter of law?

3.      Is the use of "football" in the '678 and '678 Tackle Marks ambiguous, and if so, does that use exclude flag football?

4.      If the use of "football" in the '678 and '678 Tackle Marks is ambiguous, can the Court construe those registrations, or must the jury hear evidence to determine the scope of "football"?

5.      Has FB alleged facts or claims in its Complaint that support its assertion in the Motion that Flag has infringed the Tackle Marks by posting or reposting photographs of individuals wearing apparel that includes one or more of the Tackle Marks on its social media? [1]

6.      Does the law or the evidence support FB's assertion that it is "*the* Governing Body" for flag football in the United States?

7.      Does the law or the Tackle Marks prohibit Flag's use of terms like "Governing Body," "national governing organization," or "Olympic Division" in its marketing, or are such terms mere puffery or other permissible use?

8.      Has FB proven that there are no genuine issues of material fact as to the distinctiveness of the Tackle Marks?

9.      Has FB proven that there are no genuine issues of material fact on the extent of the similarity of the Tackle Marks to USA FOOTBALL as used by Flag?

10.      Has FB proven that there are no genuine issues of material fact of the level of sophistication of and degree of care used by consumers of flag football services?

11.      Has FB proven that there are no genuine issues of material fact about how FB and Flag target the same consumers of flag football services?

12.      Has FB proven that there are no genuine issues of material fact about whether Flag intended to benefit from any goodwill associated with the Tackle Marks?

13.      Has FB presented proper evidence of actual confusion between the Tackle Marks

---

[1] Flag is filing a Motion to Strike certain evidence cited in the Motion related to this issue.

and USA FLAG as used by Flag?

14.      Absent proper summary evidence, has FB proven that there are no genuine issues of material fact about the confusion between the Tackle Marks and Flag's use of FLAG FOOTBALL for flag football services?

15.      Has FB conceded that genuine issues of material facts exist on each "digit" of confusion by admitting that the evidence favors or weighs in favor of FB.

16.      Should a jury be allowed to judge the credibility of FB's survey expert?

17.      Is the report of FB's survey expert admissible over Flag's hearsay objection?

## III.    EVIDENTIARY OBJECTIONS.

| EVIDENCE | OBJECTIONS |
|---|---|
| **Declaration of Jamie Riley, Docket No. 62-2** | |
| Riley Aff., ¶ 3.(c), (Dk. 62-2) | It is evident on their face that FB did not "make" the records attached to the Riley Affidavit as Exs. A-B, D-G, J-M, or O-Q. They are not, therefore, business records under FRE 803(6) and are each hearsay. Each also contains hearsay within hearsay. FRE 801 |
| 1.   Riley, Ex., A (Dk. 62-3) | Hearsay and hearsay within hearsay, FRE 802; Lacks proper authentication, FRE 901. Flag moves to strike it from the summary judgment record. |
| 2.   Riley, Ex. B (Dk. 62-4) | Hearsay and hearsay within hearsay, FRE 802; Lacks proper authentication. FRE 901. Flag moves to strike it from the summary judgment record. |
| 3.   Riley, Ex. C (Dk. 62-5) | Purported evidence of a claim not supported by FB's Complaint. |
| 4.   Riley, Ex. D (Dk. 62-6) | Purported evidence of a claim not supported by FB's Complaint. Flag moves to strike it from the summary judgment record. |
| 5.   Riley, Ex. E (Dk. 62-7) | Purported evidence of a claim not supported by FB's Complaint. Flag moves to strike it from the |

| | |
|---|---|
| | summary judgment record. |
| 6.   Riley, Ex. F (Dk. 62-8) | Purported evidence of a claim not supported by FB's Complaint. Flag moves to strike it from the summary judgment record. |
| 7.   Riley, Ex. G (Dkt 62-9) | Hearsay and hearsay within hearsay, FRE 802; Lacks proper authentication, FRE 901; Self-serving. Flag moves to strike it from the summary judgment record. |
| 8.   Riley, Ex. H (Dkt 62-10) | Hearsay and hearsay within hearsay, FRE 802; Lacks proper authentication, FRE 901. |
| 9.   Riley, Ex. I (Dkt 62-11) | Hearsay and hearsay within hearsay, FRE 802; Lacks proper authentication, FRE 901. Flag moves to strike it from the summary judgment record. |
| 10. Riley, Ex. J (Dk. 62-12) | Hearsay and hearsay within hearsay, FRE 802; Lacks proper authentication, FRE 901. Flag moves to strike it from the summary judgment record. |
| 11. Riley, Ex. K (Dk. 62-13) | Hearsay and hearsay within hearsay, FRE 802; Lacks proper authentication, FRE 901; Self-serving. Flag moves to strike it from the summary judgment record. |
| 12. Riley, Ex. L (Dk. 62-14) | Hearsay and hearsay within hearsay, FRE 802; Lacks proper authentication, FRE 901. Flag moves to strike it from the summary judgment record. |
| 13. Riley, Ex. M (Dk. 62-15) | Hearsay and hearsay within hearsay, FRE 802; Lacks proper authentication, FRE 901. Flag moves to strike it from the summary judgment record. |
| 14. Riley, Ex. N (Dk. 62-16) | Hearsay and hearsay within hearsay, FRE 802; Lacks proper authentication, FRE 901; Purported evidence of a claim not supported by FB's Complaint. |
| 15. Riley, Ex. O (Dk. 62-17) | Hearsay and hearsay within hearsay, FRE 802; Lacks proper authentication, FRE 901. Flag moves to strike it from the summary judgment record. |
| 16. Riley, Ex. P (Dk. 62-18) | Purported evidence of a claim not supported by FB's Complaint. Flag moves to strike it from the summary judgment record. |

| | |
|---|---|
| 17. Riley, Ex. Q (Dk. 62-19) | Purported evidence of a claim not supported by FB's Complaint. Flag moves to strike it from the summary judgment record. |
| 18. Riley, ¶ 6 - FB1640, a text message, was received by USA Football Director of Football Operations Brittney Brothers on January 8, 2024. | Hearsay, FRE 801; Lacks foundation to show personal knowledge, FRE 602; Lacks proper authentication, FRE 90. |
| 19. Riley, ¶ 15 – Flag football is a well-known subset of American football. | The Riley Declaration does not provide a foundation to show that she has personal knowledge or how she has personal knowledge to make this statement. FRE 602. The statement also constitutes an opinion for which she has not been designated. FRE 701. |
| **Other Exhibits** | |
| 20. Dk. 62-41 (Exhibit 16; 54:7-56:7) | Hearsay and Hearsay within Hearsay, FRE 802, and lacks foundation showing personal knowledge. FRE 601. |
| 21. Dk. 62-47 (Exhibit 22) | Hearsay and hearsay within hearsay, FRE 802; Lacks proper authentication, FRE 901. |
| 22. Dk. 62-50 (Exhibit 25) | Hearsay and hearsay within hearsay, FRE 802; Lacks proper authentication, FRE 901. |
| 23. Dk. 62-51 (Exhibit 26) | Botner's Report is Hearsay. FRE 802. *See* § IV.I., *infra*. Flag moves to strike it from the summary judgment record. |
| 24. IFAF Website (URLs) | The content on the IFAF website at the URLs in the Motion is not authenticated, constitutes hearsay, and contains hearsay within hearsay. FRE 802. Flag requests that the Court not consider the contents available at URLs presented in the Motion. |

## IV.    DISPUTED MATERIAL FACTS.

### A.    The Tackle Marks do not apply to flag football.

As an initial matter, a significant issue with FB's Motion is whether the services described

in the Tackle Marks apply to flag football. Neither the Complaint nor the Motion asserts that FB

owns any common law trademarks applicable to flag football. *See*, generally, *Dk. 1 ('516 Lawsuit); Dk. 62 ('465 Lawsuit)*. FB relies solely on the Tackle Marks to support the Motion. *Dk. 1 ('516 Lawsuit), p. 4, ¶¶ 13-15; Dk. 62, pp. 4-6, § III.C.; Dk. 62-2, FB Ex. 2 [Riley Decl.] ¶ 8*.

The services described in the Tackle Marks relate to "football." *Dk. 62, Dk. 62, pp. 3-6, § III.C.; Dk. 62-20, Football Ex. 2R; Dk. 62-21, Football Ex. 2S*. There are no other descriptions of the type of football covered by the registrations. *Id.*

The '472 and '236 Tackle Marks applications were filed on December 16, 2003. *Flag Exs. 5 and 6*. FB did not, however, use USA FOOTBALL in connection with flag football until 2007, more than three years later. *FB Ex. 2 [Riley Dec.] ¶ 13* ("USA Football has fielded U.S. National teams for international competition in … flag … football since 2007."); *Flag Ex. 4 [Hallenbeck Dep.] at 100:10-17*.

"The rule is clear that registration must be determined in the light of an applicant's goods as described in the application. But the goods must be those on which the mark is actually in use and must be accurately and truthfully described". *Toro Co. v. Hardigg Indus., Inc.*, 549 F.2d 785, 789 (C.C.P.A. 1977) (citation omitted). As a matter of law, the '472 and '236 Tackle Marks do not apply to flag football, as FB was not using USA FOOTBALL in connection with flag football when it filed the applications for the marks that became these two registrations. The Court accordingly should not consider these two registrations in ruling on the Motion.

The '678 and '961 Tackle Marks also do not apply to football. Considering the description of services in the applications and registrations of all four Tackle Marks together, FB intended for "football's" scope to be the same. As noted above, the '472 and '236 Tackle Marks do not apply to flag football as a matter of law. Yet FB did not broaden the scope of "football" after 2007 when it drafted the applications for '472 and '236 Tackle Marks. *Flag Exs. 7 and 8*. These two

registrations, therefore, also do not apply to football. At best, it is ambiguous whether they apply to flag football.

Flag found no cases discussing how a court is to construe an ambiguous term in trademark registrations. Patent claims construction rules do not appear to be applicable, as they are specific to the construction of patent claims. Contract construction principles also do not neatly apply to trademark registrations, as there is only one party to Tackle Marks, and such principles are largely and often exclusively based on state law. Flag believes, though, that they are instructive.

In particular, the doctrine of *contra proferentem* is "the principle that ambiguities are construed against the drafting party …" and "is based on the idea that the drafting party is likely to protect his own interest …." *Songcharoen v. Plastic & Hand Surgery Assocs., P.L.L.C.*, 561 F. App'x 327, 339 (5th Cir. 2014). Though there is only one party to the applications for the '472 and '236 Tackle Marks, FB drafted their description of services and failed to define the services sufficiently to show an intent to apply to football in its services. The Court should, therefore, construe "football" to exclude flag football in the '472 and '236 Tackle Marks.

### B.      The Plaintiffs.

Flag disputes FB's statement that it has deep national and international ties to flag football. This statement is unsupported by reference to any admissible evidence.

Flag disputes that FB's evidence supports the conclusion that it is "*the* Governing Body" of flag football. *See Flag's Ex. 1 [Burnett Dep.] 59:12-60:14; 69:2-15; 70:2-71:5; 71:20-72:1; 209:18-20; Flag's Ex. 2 [Davis Dep.] 376:2-378:20*. Flag also disputes that the "Recognized Sport Organization" ("RSO") designation previously granted to USA Football by the USOPC amounts to a designation or permission allowing USA Football to call themselves "*the* Governing Body" or "*the* National Governing Body" of flag football in the United States. USA Football has never

been the National Governing Body for flag football through the USOPC, and being an RSO does not allow an entity to call itself "*the* national governing body." Flag's dispute of FB's purported undisputed facts on this issue is detailed in its Complaint in the '465 Lawsuit.[2]

Flag also objects to FB's misleading use of "American football" throughout the Motion to refer to its services. *E.g.*, *Dk. 62, p., § III.A., pp. 2-3; § III.D., p. 9*. None of the Tackle Marks use "American football." *See Dk. 62, pp. 4-6, § III.C*. It does this to then claim, using in part the International Federation of American Football's ("IFAF") website, that flag football is a "well-known subset of American football." *Dk. 62, p. 9*. However, IFAF's "History" page first mentions flag football in 2022,[3] and its flag football rules linked on its "Rules" page are dated 2023.[4] One entity's 2023-24 hearsay statements do not constitute admissible evidence that the Tackle Marks' services, whose applications were filed years earlier, apply to flag football. In fact, FB's need to try to use these statements makes it further apparent that its use of "football" in the Tackle Registration applications does not apply to football.

FB also attempts to rely on Mr. Burnett and Mr. Davis's deposition testimony on this issue. *Dk. 62, p. 9*. Assuming, *arguendo*, that their cited testimony from 2024 supports FB's position on this issue, it is still not evidence of FB's intent to apply to football within the much earlier Tackle Football applications. Messrs. Burnett and Davis are not competent to speak to FB's intent in connection with its trademark applications. Further, while each agreed that "people believe" or "would view" flag football as a subset of football, *FB Ex. 7 [Davis Dep.] at 18:16-19; FB Ex. 5 [Burnett Dep.] at 18:22-25*, both disputed that such belief was accurate. As they have testified, tackle and flag football have different players, rules,[5] equipment, "… different everything." *Flag*

---

[2] Flag requests that the Court take judicial notice of the Complaint in the '465 matter. FED. R. EVID. 201.
[3] https://americanfootball.sport/history/ (last visited June 20, 2024).
[4] https://americanfootball.sport/wp-content/uploads/2023/05/FlagRules2023.pdf (last visited June 20, 2024).
[5] Notably, IFAF has different rule books for tackle and flag football. *See* https://americanfootball.sport/ifaf-rules (last

*Ex. 1 [Burnett Dep.] at 18:22-19:6; 58:14-60:14; 61:3-6.* They are different disciplines and are "played completely differently." *Flag Ex. 2 [Davis Dep.] at 18:16-19:5.* They are so different that boys do not play flag football as a high school sport, and not every high school offers it for girls. *Id.*; *19:15-20:12.* Unlike tackle football, flag football typically has only 5 to 8 players versus 11 for tackle football, and flag football generally can be played multiple times a day over multiple consecutive days, and the health and safety risks in flag football are generally lower relative to tackle football. *Flag Ex. 1.* FB's attempts to conflate flag and tackle football to give the impression that it has more expansive trademark rights than it does is disputed and should be rejected.

For the purposes of the Motion and this Response, Flag does not materially dispute the other facts stated in *§ III.A.*, except, as argued *supra,* the term "football" does not apply to football.

**C.      The Defendants.**

For the purposes of the Motion and this Response, Flag does not materially dispute the facts stated in *§ III.B.*

**D.      FB's Incontestable Trademarks.**

Flag disputes that the Tackle Marks include flag football in the scope of their services. *See pp. 5-8, § IV, supra.*

Flag disputes that FB has continually, since 2002, operated and sanctioned events using USA FOOTBALL in connection with flag football. *Id.* FB claims that Jamie Riley's deposition testimony at *FB Ex. 5, [Riley Dep.] 54:18-56:12* supports this assertion. The initial part of this testimony (*Id.* at 54:18-55:20), however, is in the *present* tense (i.e., in 2024), which is not evidence of FB use of USA FOOTBALL more than, for the purposes of the Motion, an inconsequential amount of time. Ms. Riley then seemingly states that FB has used USA

---

visited June 19, 2024).

FOOTBALL in connection with adult flag football going back to "2005 or '6." *Id*. at 55:21-56:12. She qualifies her answers, however, by saying that it "depend[s] upon the discipline of the sport" and "relative, again, to the discipline of the sport." *Id*. Her later testimony clarifies that her use of the term "discipline of the sport" includes all football disciplines, such as tackle and flag football. *Flag Ex. 4, [Riley Dep.] at 184:13-21; 186:21-187:5*. That clarification makes Ms. Riley's testimony at *55:21-56:12* ambiguous as to whether the disciplines to which she was referring included flag football going back to "2005 or '6." This testimony is also in conflict with her declaration and Mr. Hallenbeck's testimony, which clearly raises a genuine question of fact on when FB first used USA FOOTBALL in connection with flag football. *FB Ex. 2 [Riley Dec.] ¶ 13*; and *Flag Ex. 4 [Hallenbeck Dep.] at 100:10-17*.

Ms. Riley's testimony at *188:6-10* and Mr. Hallenbeck's testimony at *FB Ex. 1 [Hallenbeck Dep.] at 20:9-16* are merely statements of when FB was created - 2002.

Flag does not dispute the incontestability of or that FB has developed goodwill in the Tackle Marks. It does dispute that they and their goodwill apply to flag football. *See § IV.A., supra*. As set forth in greater detail below, notwithstanding their incontestability, Flag disputes that the Tackle Marks are for anything more than weak trademarks.

For the purposes of the Motion and this Response, Flag does not materially dispute the other facts stated in *§ III.C.*, except, as argued *supra,* the term "football" does not apply to football.

### E.    <u>Prior Dealings Between FB and Flag</u>.

Flag disputes FB's attempts to use Messrs. Burnett and Davis's lack of knowledge in 2017 of whether "USA Football's governance role already included flag football" is evidence that it, in fact, included flag football. *62, p. 7, § III.D.* Likewise, whether FB told them in 2017 that it had a

governance role in flag football is no evidence that it did. *Id.*

Flag disputes FB's mischaracterization of Mr. Burnett's testimony at *FB Ex. 5 [Burnett Dep.], 178:16-179:5*. FB claims that his use of "brand" in the statement that he "thought USA Football should know about [usaflagtournaments.com] since they were obviously so into protecting their *brand* …" meant "the brand, FLAG." *Id.* (emphasis added). Such characterization is neither expressed nor implied in Mr. Burnett's testimony and is not a reasonable interpretation of that statement.

For the purposes of the Motion and this Response, Flag does not materially dispute the other facts stated in *§ III.D.*, except, as argued *supra,* the term "football" does not apply to football.

**F.    Alleged Infringement and Alleged Marketplace Confusion.**

Flag objects to and disputes the relevance of the arguments in § III.E regarding Flag's alleged use of USA FOOTBALL and all testimony and exhibits cited in the eight bullet points in that section. Those arguments and evidence are outside of the facts and issues raised in the Complaint. The Complaint's allegations are strictly limited to Flag's use in commerce of "FLAG." *See e.g. Dk. 1, p. 8, ¶ 30; p. 9, ¶¶ 36. and 37, p. 10, ¶¶ 46. and 47; p. 12, ¶ 55 (incorporating prior allegations); p. 18, Prayer for Relief (seeking injunctive relief and damages only for use of "FLAG")*. The Complaint does not expressly or impliedly allege any use or assert any cause of action as to Flag's alleged use of USA FOOTBALL. Nor does it seek any form of relief for any such use. *See* Dk. 1, generally. Flag is accordingly filing a motion to strike all testimony and exhibits referenced in that section.

Flag also disputes that it has used its USA FLAG mark in connection with its social media platforms in a manner designed to cause confusion between that mark and the marks shown in the Tackle Marks. The cited testimony of Mr. Davis does not expressly or impliedly support this assertion. *FB Ex. 7 [Davis Dep.] at 148:11-25, 209:11-211:6* are merely statements of Flag's

social media platforms.

For the purposes of the Motion and this Response, Flag does not materially dispute the other facts stated in *§ III.E.*, except, as argued *supra,* except, as argued *supra,* the term "football" does not apply to football.

### G.   Alleged Depiction as an Olympics-Affiliated Organization and Governing Body.

Flag objects to and disputes the relevance of the arguments and the evidence cited in *§ III.F* regarding its use of the terms "National Championships," "World Championships," "National Team," "governing body," "ultimate governing body," "national governing organization" or "Olympic Division" in connection with any sport, including flag football. Those arguments and evidence are also outside of the facts and issues raised in the Complaint. The Complaint's allegations are strictly limited to Flag's use in commerce of "FLAG." *See* cite to FB's Complaint in § IV.F., *supra*. The motion to strike Flag is filing will also address the testimony and exhibits referenced in that section.

Flag also disputes that FB has the exclusive right to use any of the referenced terms, that Flag is not allowed to use those terms, and that its use of any of them is false or misleading. *Flag Ex. 1 [Burnett Depo] p. 310:22-311:2; 311:22-312:10; 312:25-313:9*. FB does not cite any authority nor present any evidence to substantiate its assertion that only members of IFAF, RSOs, or others "recognized … by any external authority" may use those terms. It has not done so because that is not the law. FB does not like that Flag has used superlative terms and puffery to elevate its marketing as it or many other businesses may do.

FB also implies that Flag's proposal to Nike that it be "the official and exclusive outfitter & uniform partner of the Flag National Team as it prepares the sport for the 2028 Olympics in Los Angeles" is false or misleading. *§ III.E., p. 14*. There is nothing false or misleading about that

statement. Aside from the fact that this was an ostensibly private pitch deck for Nike's eyes only, Flag clearly identifies that it refers to its own National Team, which, again, is a term that is not owned by FB or anyone else. *Flag Ex. 1, [Barnett Dep.] 179:15-181:11; 181:22-183:24*. The statement that Flag is preparing "the sport" for the 2028 Olympics is not false. *Flag Ex. 1 [Burnett Dep.] 95:18-102:13; 109:6-12*. In any event, this statement is similarly irrelevant to FB's claims that Flag infringed on the Tackle Marks through its use of FLAG as it is outside of the allegations in the Complaint. There is otherwise no evidence that Nike or anyone else was confused or misled by the statement.

FB further implies that USA Football's use of the term "Olympic Division" is false or misleading. § III.E., pp. 14-15. Again, FB has not alleged in its Complaint that it owns the exclusive right to use "Olympic Division" in connection with flag football or that Flag's use of that term is false or misleading. *See* Dkt. 1 ('516 Lawsuit), generally.

Nor has FB offered any evidence that it or anyone else has the exclusive right to use "Olympic Division" in connection with flag football or that Flag's use of that term is false or misleading. *Id.* FB's statements on this issue are irrelevant to FB's claims that Flag infringed on the Tackle Marks through its use of FLAG and should be disregarded.

### H.      Alleged Actual Confusion.

Flag disputes all but one of the bullet point statements in *§ III.G.* as they are not supported by proper summary judgment evidence. EDTX Local Rule CV-56(a) and (d). Flag has asserted objections to the admissibility of the evidence cited to purportedly support each such statement. *§ II.*, *supra*, including Chart Nos. 1-2, 4, 10-13, and 15-18. A person with personal knowledge has not authenticated the cited evidence, and they are hearsay and contain hearsay within hearsay. FB failed to prove the authenticity and any potential hearsay exception during discovery, and it cannot

now cure that failure by erroneously claiming the cited evidence as its own business records.[6]

Mr. Davis's testimony cited in the twelfth bullet point in *§ III.G.* is not evidence of confusion. He explains that he has been asked about the differences between Flag and FB. *FB Ex. 7 [Davis Dep.] at 132:11-133:3*. He even specifically states that the people asking about the relationship or differences in the two companies "have never, in [his] opinion, confused us as the same brand" and "in terms of confusing us as the same person, no." *Id. at 132:23-24 and 133:2-3*.

## I.     **Botner's Inadmissible Report.**

"An 'expert's written report 'is hearsay to which no hearsay exception applies.' '" *Pizza Hut, LLC v. Ronak Foods, LLC*, No. 5:21-CV-00089-RWS, 2022 WL 3544403, at *3 (E.D. Tex. June 17, 2022), aff'd sub nom. *Pizza Hut L.L.C. v. Pandya*, 79 F.4th 535 (5th Cir. 2023) (citations omitted) "These manner of expert reports 'are out-of-court statements by witnesses offered for their truth, and therefore fall within the definition of hearsay in Federal Rule of Evidence 801(c).'"); *Worldwide Sorbent Prod., Inc. v. Invensys Sys., Inc.*, No. 1:13-CV-252, 2014 WL 12596585, at *4 (E.D. Tex. Oct. 29, 2014) ("Pre-trial expert reports 'are hearsay and, absent agreement to their admission, are inadmissible.'"). Flag objects to Botner's report as being hearsay and requests that the Court not consider it for the purposes of deciding the Motion.

Flag otherwise disputes Botner's Report in its entirety as detailed in §VII.A.5. and 6., *supra*.

## V.     **ADDITIONAL UNDISPUTED MATERIAL FACTS**

1.     The applications for each of the Tackle Marks were filed on the following dates:

- '236 Registration – December 16, 2003 - Flag Ex.5;
- '472 Registration – December 16, 2003 - Flag Ex. 6;

---

[6] The motion to strike Flag is filing also seeks to strike those portions of the Riley Declaration that claim that a) she has personal knowledge that the materials in question were made at or near the time by – or from information transmitted by – someone with knowledge, and b) that those materials were made by FB. It is clear from the face of these materials that they were not made by FB. In any event, those materials contain hearsay within hearsay, for which no exception applies. Flag will also show that FB did not identify the vast majority of the people in the cited evidence as persons likely to have discoverable information as required by Rule 26(a)(1).

-    '678 Registration – January 12, 2016 - Flag Ex. 7; and
-    '961 Registration – June 14, 2013 - Flag Ex. 8.

**2.**     The USPTO granted Flag registration on the Supplemental Registration for USA FLAG for "[a]rranging and conducting of sports events; [a]ranging and conducting youth sports programs in the field of flag football; [s]ports camp services." *Flag Ex. 9*. It did not refuse the application because USA FLAG for sporting events, including flag football, was not likely to be confused with any of the Tackle Marks.

## VI.     <u>SUMMARY JUDGMENT STANDARD.</u>

Summary judgment is appropriate when the movant is able to demonstrate that the pleadings, affidavits, and other evidence available to the court establish there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The movant bears the initial burden to demonstrate the absence of any material fact. *Celotex v. Catrett*, 477 U.S. 317, 332 (1986). If the movant meets that burden, the non-movant must point to admissible evidence demonstrating there is a genuine issue for trial. FED. R. CIV. P. 56(e). Unsubstantiated assertions, conclusory allegations, improbable inferences, and unsupported speculation are not competent evidence. *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.1994). Instead, the nonmovant must go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue of material fact for trial. *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 493 (5th Cir.2001) (quoting Celotex, 477 U.S. at 324).

In ruling on a summary judgment motion, the court must consider all evidence and draw all inferences from the factual record in the light most favorable to the nonmovant, but the court may not make credibility determinations or weigh the evidence. *Turner v. Baylor Richardson Med. Ctr.*,476 F.3d 337, 343 (5th Cir.2007) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S.

133, 150 (2000)).

## VII.   **ARGUMENT**.

### A.     **There are Questions of Material Fact as to Likelihood of Confusion**.

"Likelihood of confusion is a question of fact."[7] *Gibson Brands, Inc. v. Armadillo Distribution Enterprises, Inc.*, 668 F. Supp. 3d 614, 648 (E.D. Tex. 2023 - ALM).

### 1.     **The Tackle Marks do not apply to Flag Football as a matter of law**.

The '472 and '236 Tackle Marks do not apply to flag football because their respective applications were filed more than three years before FB began using USA FOOTBALL in connection with flag football. *See § IV.A., infra*. The '678 and '961 Tackle Marks also do not apply to flag football for the reasons stated in *§ IV.A, infra*.

### 2.     **There is a genuine issue of fact as to the level of distinctiveness of the Tackle Marks and, therefore, a genuine issue of fact as to the level of protection it should be afforded**.

"Any given term's correct [distinctiveness] classification is a factual issue." *Xtended Beauty, Inc.*, 576 F.3d 221, 227 (5th Cir. 2009), citing *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1183 n. 12 (5th Cir. 1980).

"Marks are normally assigned to 'categories of generally increasing distinctiveness': (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful.'" *Xtreme Lashes*, 576 F.3d at 227 (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). " '[W]ithin this spectrum the strength of a mark, and of its protection, increases as one moves away from generic and descriptive marks toward arbitrary marks.'" *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 330 (5th Cir. 2008) quoting *Falcon Rice Mill, Inc. v.*

---

[7] In concluding its argument on the "digits of confusion," FB states that "[t]his factor favors USA Football" or "weights [sic] strongly in USA Football's favor." Dk. 62, § V.C., pp. 21, 23, 24, 26, and 27. FB is arguing as though the Motion is an application for a temporary injunction where a court weighs and considers which party each digit favors. If a factor merely favors a party, there is definitively a fact question on that digit.

*Cmty. Rice Mill, Inc.*, 725 F.2d 336, 346 (5th Cir.1984) (citation omitted). "To determine the strength of a mark, [the court] examine[s] (1) 'where the mark falls on a spectrum ....' of categories and (2) 'the standing of the mark in the marketplace. *Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*, 982 F.3d 280, 290 (5th Cir. 2020) quoting *Am. Rice*, 518 F.3d at 330.

In *USA Football, Inc. v. Robinson*, No. H-03-4858 (NFA), In the Southern District of Texas, Houston Division (the "Robinson Lawsuit"), FB sought declaratory relief that its use of USA FOOTBALL did not infringe on the defendant's use of the same identical mark, which he also used in connection with football-related services. *Flag Ex. 16, pp. 1, 7.*[8] In the Third Amended Complaint, FB judicially admitted, among other things, there were "a number of third party uses incorporating the terms 'USA' and 'Football," including other uses of 'USA Football.'" *Flag Ex. 16*, p. 5. It further agreed "that the geographic designation 'USA,' coupled with the generic term 'football,' could not form the basis for trademark rights when used to identify a football team comprised of players from the United States.'" *Id.* Judge Nancy Atlas, ruling on FB's motion for summary judgment, agreed with FB and "ORDERED that Plaintiffs the National Football League and USA Football, Inc.'s use of the trademark "USA Football" to promote the sport of amateur football at the high school and youth level in the United States does not infringe the rights of Defendants Timothy Robinson and USA Football, Inc. because it does not infringe a protected trademark, dilute a protected trademark, constitute a false designation of origin, or constitute unfair competition as to Defendants[.]" *Flag Ex. 17*. While the court's judgment was brief, she performed a lengthier analysis in a Memorandum and Order. *USA Football, Inc. v. Robinson*, No. H-03-4858,

---

[8] Flag requests that the Court take judicial notice of the file in the Robinson Lawsuit. FED. R. EVID. 201. Flag attaches the Third Amended Complaint and the Final Judgment as *Flag Exs. 16 and 17*. Flag obtained these documents through Westlaw. PACER does not have active links for the court's docket. By the time Flag discovered the Robinson Lawsuit, there was insufficient time to obtain copies of other potentially relevant pleadings and motions to attach them as exhibits to this Response. Flag intends to continue to attempt to obtain other potentially relevant pleadings and motions, such as FB's Motion for Summary Judgment and its evidence and will supplement the record for this Response when it is able to obtain those documents.

2004 WL 3363843, at *4 (S.D. Tex. Sept. 20, 2004). In that Memorandum, the court noted that FB contended that "the trademark 'USA Football' is descriptive, and therefore is entitled to protection only if it has acquired secondary meaning.'" *Id*. After a detailed analysis of the facts, the court found that "the trademark 'USA Football' is properly classified as *descriptive* under the undisputed facts of this case." *Id.* at 7. (Emphasis added). The undisputed facts included evidence that Robinson's use of "USA FOOTBALL" had been insufficient to acquire secondary meaning. *Id.* at *1-4.

Flag recognizes that the USPTO found that the Tackle Marks had acquired distinctiveness after originally being merely descriptive. Flag also recognizes that the Tackle Marks are now incontestable and that it, therefore, cannot assert that they lack secondary meaning. But " '[i]ncontestable status does not make a weak mark strong.'" *Gibson Brands*, 668 F. Supp. 3d at 650, quoting *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 171 (5th Cir. 1986).

The '472 Tackle Mark disclaims the exclusive right to use "FOOTBALL." *Flag Ex. 10*. The '236 Tackle Mark is a design mark that has a distinctiveness limitation as to "FLAG FOOTBALL." *Flag Ex. 11*. The '678 Tackle Mark is also a design mark that has, like the '236 mark, a distinctiveness limitation as to "FLAG FOOTBALL," and disclaims the exclusive right to use "Football." *Flag Ex. 12*. The '961 Tackle Mark also disclaims the exclusive right to use "FOOTBALL." *Flag Ex. 13*.

In addition to the weakness of the Tackle Marks, a " 'key inquiry … is determined by ... standing in the marketplace." *Molson Coors*, 982 F.3d at 293 (quoted citation omitted). "Specifically, evidence of 'third-party single and multi-word uses' of a mark tends to show weakness. *Id.* (citation omitted). "[T]hird-party usage involving the plaintiff's entire mark [is not required], but instead only the portion of the plaintiff's mark that the defendant also uses." *Id.* Any

strength that suggestive mark may have "is substantially undercut by their lack of recognition in the market and widespread third-party use." *Springboards To Educ., Inc. v. Houston Indep. Sch. Dist.*, 912 F.3d 805, 815 (5th Cir. 2019), as revised (Jan. 29, 2019), as revised (Feb. 14, 2019)

The common term both parties use is "USA," which is a geographic descriptor. *See Vision Info. Techs., Inc. v. Vision IT Servs. USA, Inc.*, 156 F. Supp. 3d 870, 882 (E.D. Mich. 2016). A search on the USPTO's Trademark Search system[9] returns 4,321 results for live registrations that include the term "USA." *Flag Ex. 14.* The system also returns 662 results for a search for live registrations that include the term "FOOTBALL." *Flag Ex. 15.* "[E]xtensive evidence of third-party use and registrations is 'powerful on its face,' even where the specific extent and impact of the usage has not been established." *Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.*, 797 F.3d 1363, 1373–74 (Fed. Cir. 2015) (citation omitted).

FB points to four areas that it contends support its claim that the Tackle Marks have a strong standing in the marketplace. Dk. 62, § V.C., p. 21. FB does not, however, provide any evidence of which of the claimed partners are for tackle versus flag football. Nor does it provide any evidence of how many of the players that it has "helped" train and educated were for tackle versus flag football. Some of the partnerships are with well-known, if not famous, brands. FB presents no evidence from which to discern facts, such as whether any number of the coaches and players came to a training event because the NFL, Riddell, or Arena Football League, as examples, were holding or participating in the event. FB presents no evidence of what it means, in terms of strength in the marketplace, to field a team in international competition. And it has not provided any evidence of how many teams have been involved, how many spectators have attended, or how much revenue has been generated from its flag football tournament.

---

[9] https://tmsearch.uspto.gov/search/search-information

USA FOOTBALL, both as a word mark and as used in the design marks, is suggestive. "[S]uggestive marks—like descriptive marks—are 'comparatively weak.'" *Molson Coors*, 982 F.3d at 292, quoting *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 315 (5th Cir. 1981). The Tackle Marks are weak suggestive marks and should be given minimal protection.

### 3. **A genuine issue of facts exists as to the similarity of USA FLAG and USA FOOTBALL and, therefore, a genuine issue of fact as to whether there is a likelihood of confusion.**

 "Whether similarity of trademarks deceives or is likely to deceive purchasers is a fact question." *Coca-Cola Co. v. Cahill*, 350 F. Supp. 1231, 1235 (W.D. Okla. 1972), aff'd, 480 F.2d 153 (10th Cir. 1973).

"Mark similarity 'is determined by comparing the marks' appearance, sound, and meaning." *Xtreme Lashes*, 576 F.3d at 228. Flag's "USA FLAG" mark and the Tackle Marks share only one commonality – both use the geographic descriptor "USA." However, the appearance, sound, and meaning of each "FLAG" and "FOOTBALL" are not similar at all. The appearance and sound of the combined USA FLAG and USA FOOTBALL are similar only in their common use of "USA." Overall, the similarity between these marks is minimal. In any event, a jury should be allowed to weigh this factor in connection with its determination of the likelihood of confusion.

FB again points to IFAF's website to claim that flag football is a well-known subset of "American football." Flag incorporates its arguments and authorities from *§ IV.B.*, *supra*.

### 4. **The degree of care by potential purchasers is a fact question.**

The sophistication of potential purchasers of goods and services is a fact question for the jury. *See Neles-Jamesbury, Inc. v. Valve Dynamics, Inc.* ("… Defendants' argument regarding the sophistication of their customers raises a fact question on the potential degree of care factor.)

### 5. **Whether Flag and FB target the same consumers is a fact question.**

While there is some evidence that Flag and FB pursue some of the same consumers, that

evidence does not eliminate identical crossover. Nor does it prove any specific level of crossover in the targeted consumers of flag football services.

### 6.     FB has not proven that there is no genuine issue of material fact on whether Flag intended to benefit from any goodwill in the Tackle Marks.

FB does not cite any direct evidence proving as a matter of law that Flag intended to benefit from any goodwill associated with the Tackle Marks. It relies on, for example, a purported right of FB to preclude Flag's use of the term "Olympics Division."

### 7.     The Motion does not present proper summary judgment evidence of actual confusion.

None of the documents or testimony FB cites on the question of actual confusion is proper summary judgment. *See §§ IV.H.-I., supra.* The emails, text messages, and other documents it claims are evidence of actual confusion, as well as the Botner Report, are hearsay for which there is no exception, and contain hearsay with hearsay (The business records testimony in Ms. Riley's Declaration for material created by third parties is demonstrably untrue) and lack proper authentication. The Botner report is also hearsay, for which there is no exception. A genuine issue of fact exists as to whether there has been actual confusion. *Citizens Nat. Bank of Meridian v. Citizens Bank of Philadelphia Mississippi*, 35 F. App'x 391 (5th Cir. 2002) (Finding that "the evidence presented by [the accuser] fail[ed] [on summary judgment] to create a question of material fact as to whether customers … [would] be confused by the opening of [the accused's] branch.")

### 8.     Questions of material facts exist as to the credibility of Botner and his survey.

"[I]t ordinarily is the province of the jury to gauge the expert witness['s] credibility and the reliability of his data." *Newport Ltd. v. Sears, Roebuck & Co.*, 6 F.3d 1058, 1069 (5th

Cir.1993); *Skidmore v. Precision Printing & Pkg., Inc.*, 188 F.3d 606, 618 (5th Cir. 1999). Significantly, Botner's Report is inadmissible hearsay to which Flag objects. *See* § IV.I., *supra*. Without waiving this objection, Flag necessarily cites Botner's Report and data from it to point out their flaws and weaknesses in defending against the Motion.

FB relies heavily on the Botner Report to argue that the survey "shows a high rate of likely confusion." *Dkt. 62 p. 17-18, 25; Dkt. 62-51*. Botner's survey results claim a net confusion rate of 25.6% between the Tackle Marks and the USA FLAG Mark, allegedly owing "primarily due to name similarity, as well as a similar appearance or design." *Dkt. 62-51 ¶ 84*. However, Botner's methodology, categorization of short answer responses, and resulting net confusion rate are misleading and fundamentally flawed for many reasons, including several detailed below.

Botner surveyed both source and affiliation/connection confusion with separate questions. Botner asked respondents whether any of the four companies' web pages (USA Flag, USA Football, American Flag Football League ("AFFL"), and NFL Flag) "are owned or operated by the same company" (Question 1) or whether any of the web pages "are from companies or organizations that are connected or affiliated with each other" (Question 4). *Dkt. 62-51 ¶ 64, Table A & ¶ 68, Table C*. A control substituted the control mark "FFWCT" in place of "USA Flag" (although it should have used a different USA mark to be a suitable control). Follow-up questions (Question 2 and Question 5) allowed respondents to select as many web pages as they would like (up to all four). *Dkt. 62-51 ¶ 66, Table B; ¶ 70-72, Table D*. If respondents selected the web pages of USA Flag and USA Football, Botner counted them as "confused" in his survey. *Dkt. 62-51 ¶ 72-73, Table E*. Botner found that 109 of 253 test respondents were "confused." *See Botner Report Ex. 18B. Data File Condensed*. If a respondent indicated confusion between USA Flag and USA Football (even if AFFL and/or NFL Flag were also selected), they were then asked an open-ended

question: "What makes you think that?" (Question 3 and Question 6). *Dkt. 62-51 ¶ 74, Table F*. With his report, Botner produced a data file and data map which allowed for review of the underlying data.

In categorizing the short answer responses to the "What makes you think that?" questions — Botner grouped 23.7% of test respondents into the "name similarity" category. *See Dkt. 62-51, p. 31, Table F*. Examples of the verbatim responses that Botner counted as name confusion include:

ID #21: "Because they have the same name USA in it"

ID #78: "They look similar and both have USA in the name"

ID #151: "Has the word USA Stands out like a sword thumb they don't call it the United States for nothing

ID #159: "It because it contains the name "USA" and they're both football related."

ID #163: "They both have usa in the title and similar tjemes"

ID#319: "both start with USA and have the same colors"

ID#321: "They both say usa"

ID#458: "They both say USA"

ID#476: "Both are "USA" flag football organizations"

ID#495: "there is "usa" in the names which gives me the clue that they are owned by the same company/organization"

ID#538 "They are both USA named"

*See Ex. 18C, Botner Report Data File Condensed.*

The examples mentioned above, along with others highlighted in Botner's Report Data Table, indicate that the survey primarily detected confusion related to the term "USA" rather than considering the marks in their entirety. Overall, fifty-two (52) respondents mentioned the term "USA" as the source of their confusion (*see Ex. 18C, Botner Data Table*). Consequently, nearly half[10] of the allegedly "confused" test respondents, who were sorted and counted based on "name

---

[10] One hundred nine (109) respondents indicated that the parties' websites had common ownership or affiliation. Fifty-two (52) of those respondents mentioned the common term "USA" as the reason for their selection. As such, the data

similarity" in Botner's survey, were categorized by Botner as finding similarity in the marks solely because they both use "USA."

Similarity of appearance is determined based on the total effect of the mark or designation rather than on a comparison of individual features. *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 260-61 (5th Cir. 1980). When comparing marks, "it is the overall impression that counts," *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 502 (5th Cir. 1979), "rather than simply comparing individual features of the marks," *Exxon Corp. v. Tex. Motor Exch. of Houston, Inc.*, 628 F.2d 500, 505 (5th Cir. 1980); *Shen Manufacturing Co. v. Ritz Hotel, Ltd.*, 393 F.3d 1238, 1242-43 (Fed. Cir. 2004) (similarity or dissimilarity of the marks must be determined by viewing marks in their entireties); *Packard Press, Inc. v. Hewlett-Packard Co.*, 227 F.3d 1352, 1358 (Fed. Cir. 2000) ("The ultimate conclusion of similarity or dissimilarity of the marks must rest on consideration of the marks in their entirety."); *see also In re Nat'l Data Corp.*, 753 F.2d 1056, 1059 (Fed. Cir. 1985).

When excluding the fifty-two (52) respondents who cite "USA" as the reason for their confusion, the test confusion drops from 43.1% to 22.5%,[11] and net confusion drops from 25.6% to 5.1%.[12] This percentage is well below the Fifth Circuit's generally accepted minimum of 15% and creates a significant fact issue as to the likelihood of confusion element. *See Dallas Cowboys Football Club, Ltd. v. America's Team Props., Inc.*, 616 F. Supp. 2d 622, 641 (N.D. Tex. 2009) (a confusion rate as low as 15% is generally "within the range accepted by courts…in assessing likelihood of confusion."); *see also Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d

---

suggests that 47.8% of confused test respondents were confused based on the term USA alone.
[11] Botner found test confusion of 43.1% or 109/253. Removing 52 respondents changes the equation to 57/253 or 22.5%.
[12] Botner subtracts the control confusion rates to derive a net confusion percentage of 25.6% (43.1% - 17.4%). When this same control percentage is subtracted from the adjusted test confusion rate that removes respondents who answered based on the term "USA" — the result is 5.1% (22.5% - 17.4%).

500, 507 (5th Cir. 1980) (finding 15% and 23% "strong evidence" of likelihood of confusion*);
Tiffany & Broadway, Inc. v. Commissioner of Pats. & Trademarks*, 167 F. Supp. 2d 949, 955 (S.D. Tex. 2001) (association by 15% of survey respondents constituted likelihood of confusion).

The way Botner compiled and organized the "confusion" data regarding the term "USA" raises questions about the credibility of his opinions. Therefore, a jury should be permitted to consider his survey and his opinions and assign whatever weight it believes appropriate, if any. *Newport Ltd. v. Sears, Roebuck & Co.*, 6 F.3d 1058, 1069 (5th Cir. 1993) ("Where … the district court has not excluded expert evidence as inadmissible, it ordinarily is the province of the jury to gauge the expert witnesses credibility and the reliability of his data."); *VirnetX Inc. v. Cisco Sys., Inc.*, No. 6:10-CV-417, 2014 WL 12605380, at *5 (E.D. Tex. Mar. 28, 2014) ("The Court may not overrule the jury's assessment of the credibility of the experts or its determination of a factual dispute.").

Additional questions regarding Botner's survey methodology are raised because Botner failed to exclude respondents who selected three or four entities as being "the same company" or "affiliated or connected" companies (i.e., FB + USA Flag + NFL Flag and/or AFFL) from the data set and confusion calculations. Answers reflecting confusion between three or all entities show generalized confusion by the respondent — not confusion specific to FB and USA Flag. This is essentially "noise" in the survey results. Because these respondents were generally confused about even the buffers (i.e. NFL Flag and/or AFFL), their answers should have been excluded from the survey results. These generally confused respondents amount to 47 of the 109 "confused" test respondents. *Ex. 18D, Botner Data File, 3 or More Entries Selected*.

When generalized confusion is removed, and respondents who only selected FB and USA

Flag are isolated, the test confusion drops from 43.1% to 24.5%[13] and net confusion drops from 25.6% to 7.1%.[14] Again, this percentage is well below the Fifth Circuit's generally accepted minimum and creates a significant fact issue as to the likelihood of confusion element.

In sum, Botner's survey methodology and findings raise significant credibility and fact issues that a jury should be permitted to consider. The survey, which FB relies on to argue a high rate of likely confusion between the USA FOOTBALL Marks and the USA FLAG Mark, shows a net confusion rate of 25.6%, primarily due to name similarity. However, the categorization of responses and the resulting confusion rate are fundamentally flawed. The survey primarily detects confusion related to the term "USA" rather than considering the marks in their entirety, with fifty-two (52) respondents citing "USA" as the source of their confusion. Additionally, Botner failed to exclude respondents who selected multiple entities (FB, USA Flag, NFL Flag, and/or AFFL) as being the same or affiliated companies, leading to generalized confusion not specific to FB and USA Flag. Excluding these generally confused respondents, the test confusion drops from 43.1% to 24.5%, and net confusion drops from 25.6% to 7.1%, well below the Fifth Circuit's generally accepted minimum of 15%. Therefore, the credibility of Botner's opinions and the likelihood of confusion should be determined by a jury.

## VIII.  THE PURPORTED VICARIOUS LIABILITY OF TRAVIS BURNETT.

The purported liability of Mr. Burnett depends entirely on FB's success on its claim that it is entitled to summary judgment on the issue of the likelihood of confusion. As shown throughout this Response, FB has failed to prove that there are no questions of material fact on that issue, and

---

[13] Botner found test confusion of 43.1% or 109/253. Removing 47 respondents changes the equation to 62/253 or 24.5%.
[14] Botner subtracts the control confusion rates to derive at a net confusion percentage of 25.6% (43.1% - 17.4%). When this same control percentage is subtracted from the adjusted test confusion rate that removes respondents who selected three or more entities and showed general confusion — the result is 7.1% (24.5% - 17.4%).

instead, there are multiple questions of material fact that a jury must resolve to decide whether there is a likelihood of confusion. The Court should, therefore, deny the Motion on this point as well.

### IX.   INDIANA'S CONVERSION STATUTE.

Flag was initially sued for infringement in Indiana. Dk. 1, '516 Lawsuit. Flag moved to dismiss the Indiana court's personal jurisdiction over the respect constituents of Flag, or alternatively to transfer that lawsuit to the Eastern District of Texas pursuant to 28 U.S.C. § 1404. Dks. 20 and 21, '516 Lawsuit. As a result of that challenge, FB offered to agree to transfer the '516 case to the Eastern District of Texas, Sherman Division. Flag agreed. Dk. 30, '516 Lawsuit.


Like the purported liability of Mr. Burnett, a finding in favor of FB on its Indiana Conversion Statute is dependent on a determination by the Court that there are no questions of material fact as to whether there is a likelihood of confusion. FB has not met its summary judgment burden on this issue. There are many genuine questions of material fact on that issue. The Court should, therefore, deny the Motion on this point as well due to such questions.

### X.   PRAYER.

Each of FFWCT, LLC, USA Flag, LLC, and Travis Burnett respectfully request that the Court deny USA Football, Inc.'s Motion for Summary Judgment in its entirety and grant them such other and further relief to which they are entitled.

Respectfully submitted,

/s/ *Bryan Haynes*

**Bryan Haynes**
Texas Bar No. 09283520
Bryan.Haynes@solidcounsel.com
**SCHEEF & STONE, L.L.P.**
2600 Network Blvd., Suite 400
Frisco, Texas 75034
(214) 649-29511 Telephone
(214) 472-2150 Fax

**Mark D. Nielsen**
Texas Bar No. 24062361
Mark.Nielsen@solidcounsel.com
**SCHEEF & STONE, L.L.P.**
2600 Network Blvd., Suite 400
Frisco, Texas 75034
(214) 472-2100 Telephone
(214) 472-2150 Fax

**Michael C. Smith**
Texas Bar No. 18650410
Michael.Smith@solidcounsel.com
**SCHEEF & STONE, L.L.P.**
113 East Austin Street
Marshall, Texas 75670
(903) 938-8900 Telephone

**ATTORNEYS FOR PLAINTIFFS FFWCT,
LLC, USA FLAG, LLC, AND TRAVIS
BURNETT**

## CERTIFICATE OF SERVICE

I certify that on June 21, 2024, a true and correct copy of the foregoing was electronically filed with the Court using the ECF system, which will send a notification of the filing via electronic mail to all counsel of record.

/s/ *Bryan Haynes*

Bryan Haynes